MARDAN CORPORATION,
Plaintiff-Appellant,

v.

C.G.C. MUSIC, LTD. and Macmillan,
Inc., Defendants-Appellees.

No. 85–1520.

United States Court of Appeals,
Ninth Circuit.

Argued Aug. 14, 1985.

Submitted Aug. 30, 1985.

Decided Nov. 25, 1986.

Karen L. Florini, Dept. of Justice, Washington, D.C., Renee R. McDermott, Barnes & Thornburg, Indianapolis, Ind., for plaintiff-appellant.

Warren S. Radler, Barbara B. Guibord, Rivkin, Leff, Sherman & Radler, Chicago, Ill., for defendants-appellees.

Before HUG, NORRIS and REINHARDT, Circuit Judges.

NORRIS, Circuit Judge:

This appeal concerns the liability provisions of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9601–9657 (1982), which was enacted in 1980. CERCLA was a response by Congress to the threat to public health and the environment posed by the widespread use and disposal of hazardous substances. Its purpose was to ensure the prompt and effective cleanup of waste disposal sites, and to assure that parties responsible for hazardous substances bore the cost of remedying the conditions they created. 126 Cong.Rec. 31964 (statement of Rep. Florio).

Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), authorizes both governmental and private entities to sue statutorily defined "responsible parties" to recover costs incurred in cleaning up hazardous waste disposal sites. The appeal arises out of a suit brought by one private responsible party against another to recover damages for costs incurred in cleaning up and closing a waste disposal site in Nogales, Arizona, that was subject to regulation under

the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901–6987 (1982).

## I

By agreement dated July 10, 1980 (the "Purchase Agreement"), appellant Mardan Corporation ("Mardan") acquired certain assets from appellee Macmillan, Inc. ("Macmillan").[1] Among the assets acquired were a plant, equipment and related real property in Nogales, Arizona, used in the manufacture of musical instruments.

Macmillan had manufactured instruments at the Nogales plant for ten years prior to the sale. During that period, Macmillan deposited waste streams from the plant's electroplating operations into a settling pond at the site. Wastes deposited into the settling pond included heavy metals, cyanide, solvents including trichloroethylene and other electroplating wastes. When Mardan acquired the property, it continued to use the plant to manufacture musical instruments, generating many of the same wastes and depositing them in the same settling pond.

In August 1980, prior to the sale of the Nogales plant, Macmillan filed with the United States Environmental Protection Agency ("EPA") a Notification of Hazardous Waste Activity notifying EPA that it generated and disposed of hazardous waste at the plant. When Mardan acquired the plant in November 1980, it qualified for interim status for the settling pond pursuant to RCRA.[2]

In November 1981, the parties executed an "Agreement of General Settlement and Release" ("Settlement Agreement") under which Macmillan paid Mardan $995,000 in settlement of a variety of claims arising out of the Purchase Agreement, including claims of former plant employees for vacation and severance pay, various accounts receivable, and "certain other claims ... based upon or arising out of the Purchase Agreement and the transactions contemplated therein." The parties specified that $213,944 of the $955,000 related to liabilities for severance and vacation pay, while the remaining $781,055 related to "other claims asserted under the Purchase Agreement." The language of the Settlement Agreement and the accompanying "General Release and Receipt" (the "Release") encompassed "all actions, causes of action, suits, ... based upon, arising out of or in any way relating to the Purchase Agreement...."

In 1983 the EPA brought administrative enforcement actions against Mardan for violation of the RCRA interim status requirements at the Nogales plant. The administrative actions were resolved by a Consent Agreement between the EPA and Mardan which required Mardan to clean up and close the settling pond. Specifically, Mardan agreed to install a groundwater monitoring system and to raise the level of the dike surrounding the settling pond.

Mardan then brought this action against Macmillan under section 107 of CERCLA, seeking to recover damages for costs incurred and to be incurred by Mardan in cleaning up and closing the waste disposal site. Mardan's complaint alleged that the cost of complying with the Consent Agreement would exceed $500,000 and could run as high as $1,550,000.

1. The Nogales plant and other assets acquired by Mardan had actually been owned and operated by C.G.C. Music, a subsidiary of Macmillan. Mardan named both Macmillan and C.G.C. Music as defendants in this CERCLA action. C.G.C. Music had been dissolved before the action was commenced, but the action was filed within three years of dissolution as required by Del. Code Ann. tit. 8, §§ 259, 278. For convenience, Macmillan and C.G.C. Music will be referred to simply as "Macmillan" throughout this opinion.

2. Mardan qualified for interim status by filing a permit application pursuant to section 3005(e)

of RCRA and by satisfying requirements set forth at 40 C.F.R. § 5270.70. Section 3005(e) allows a preexisting facility that has applied for a permit to "be treated as having been issued such permit until such time as final administrative disposition of such application is made." 42 U.S.C. § 6925(e). At about the same time, Mardan also obtained temporary approval from the State of Arizona to operate the facility; that temporary approval was conditioned upon Mardan's compliance with RCRA regulations then in effect.

The district court granted summary judgment to Macmillan. Although the court ruled that the costs incurred by Mardan in cleaning up and closing the Nogales site constituted "necessary costs of response" within the meaning of section 107(a)(4)(B) of CERCLA and that Macmillan was liable for the response costs incurred by Mardan because it was a "responsible party" within the meaning of section 107(a), it awarded Macmillan summary judgment on two alternative grounds: (1) that Mardan's action under section 107 of CERCLA was barred by the terms of the Release executed by Mardan as part of the 1981 Settlement Agreement, and (2) that Mardan's action was barred by the doctrine of unclean hands. *Mardan Corp. v. C.G.C. Music, Ltd.,* 600 F.Supp. 1049 (D.Ariz.1984).

The district court had subject matter jurisdiction under section 113 of CERCLA, 42 U.S.C. § 9613 (1982). Our jurisdiction rests on 28 U.S.C. § 1291. Because we affirm the summary judgment on the ground that Mardan's CERCLA action is barred by the terms of the Settlement Agreement and the Release, we need not decide whether the doctrine of unclean hands may be invoked as a defense to a private action brought under Section 107 of CERCLA.[3] We review the district court's grant of summary judgment *de novo. Lojek v. Thomas,* 716 F.2d 675, 677 (9th Cir. 1983). Summary judgment is appropriate only if, "viewing the evidence in the light most favorable to the opposing party, ...

there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Id.*

## II

Before deciding whether Mardan's action under section 107 of CERCLA is foreclosed by the Settlement Agreement and the Release, we must first consider whether the district court was correct in utilizing New York law as the rule of decision or whether it should have developed a uniform federal rule to decide the issue. From the outset, we must be clear that federal law governs the issue, for federal law always governs the validity of releases of federal causes of action. *See Dice v. Akron, Canton & Youngstown R.R. Co.,* 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952); *Salmeron v. United States,* 724 F.2d 1357, 1361 (9th Cir.1983); *Jones v. Taber,* 648 F.2d 1201, 1203 (9th Cir.1981). But that is only the initial step in the analysis. The next step is to determine whether, although federal law governs, state law should be incorporated to provide the content of that federal law. *See, e.g., Burks v. Lasker,* 441 U.S. 471, 477, 99 S.Ct. 1831, 1836, 60 L.Ed.2d 1404 (1979); *United States v. Kimbell Foods,* 440 U.S. 715, 727–28, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979). Clearly the fact that federal law governs does not always mean that federal courts should fashion a uniform federal rule, even if the federal question involves the scope of a federal statutory right or the interpreta-

---

**3.** The government argues that the "unclean hands" defense, as applied by the district court, would effectively eviscerate a federal common law right of contribution under CERCLA. Brief for *Amicus* at 10–14. While we know of no appellate court decision on point, most district courts that have faced the issue have interpreted section 107 of CERCLA to impose, as a matter of federal law, joint and several liability for indivisible injuries with a correlative right of contribution. *See, e.g., Colorado v. ASARCO, Inc.,* 608 F.Supp. 1484 (D.Colorado 1985); *Wehner v. Syntex Agribusiness,* 616 F.Supp. 27 (E.D. Mo.1985); *United States v. Ward,* 8 Chem. & Rad.Waste Litig.Rep. 484, 487 (D.N.C. May 14, 1984); *United States v. Northeastern Pharmaceutical and Chemical Co.,* 579 F.Supp. 823, 844–45 (W.D.Mo.1984); *United States v. A & F Materials*

*Co.,* 578 F.Supp. 1249, 1256–57 (S.D.Ill.1984); *United States v. Wade,* 577 F.Supp. 1326, 1338 (E.D.Pa.1983); *United States v. Chem-Dyne,* 572 F.Supp. 802, 807 n. 3 (S.D.Ohio 1983). The commentators have also concluded that a federal right of contribution attends CERCLA. *See, e.g.,* Smith, *A Right to Contribution in Superfund Cost-Recovery Actions,* 8 Chem. & Rad.Waste Litig.Rep. 41 (1984). Note, *A Right of Contribution Under CERCLA: The Case for Federal Common Law,* 71 Cornell L.Rev. 668 (1986); Note, *The Right to Contribution for Response Costs Under CERCLA,* 60 Notre Dame Law Review 345 (1985); Note, *Generator Liability Under Superfund for Clean-Up of Abandoned Waste Dumpsites,* 130 U.Pa.L.Rev. 1229, 1266 n. 184 (1982).

tion of a phrase in a federal statute. *See, e.g., Burks*, 441 U.S. at 477, 99 S.Ct. at 1836; *DeSylva v. Ballentine*, 351 U.S. 570, 580–81, 76 S.Ct. 974, 979–80, 100 L.Ed. 1415 (1956); *Reconstruction Finance Corp. v. Beaver County*, 328 U.S. 204, 209–10, 66 S.Ct. 992, 995, 90 L.Ed. 1172 (1946). Frequently, state rules of decision will furnish an appropriate and convenient measure of the governing federal law. *See Kimbell Foods*, 440 U.S. at 728, 99 S.Ct. at 1458; *DeSylva*, 351 U.S. at 580–81, 76 S.Ct. at 980–81; *P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System* 768 (1953).

■ In a case such as this one, which implicates a federal statute, the predominant consideration must be Congressional intent: the key question is whether Congress intended federal judges to develop their own rules or to incorporate state law to decide which "agreement[s]" would be recognized under section 107(e)(1). *Cf. Burks*, 441 U.S. at 478, 99 S.Ct. at 1837 (looking at what Congress indicated); *DeSylva*, 351 U.S. at 580, 76 S.Ct. at 980 (looking to legislative scheme). If Congress had explicitly directed federal judges either to develop uniform federal standards or to adopt state law, then the issue would be settled. *See Kimbell Foods*, 440 U.S. at 740, 99 S.Ct. at 1464 (noting that the Court's conclusion under the three-part test it applied could be altered by "congressional directive."). In the absence of some clear congressional intent, a court must also decide whether formulating a federal rule would be appropriate as a matter of judicial policy under the three-part test established by *Kimbell Foods*. Under that test, a court must determine the following: (1) whether the issue requires "a nationally uniform body of law"; (2) "whether application of state law would frustrate specific objectives of the federal programs"; and (3) whether "application of a federal rule would disrupt commercial relationships predicated on state law." *Id.* at 728–29, 99 S.Ct. at 1458–59 (consolidating various lines of authority into one test). If the federal courts determine that state law should be

incorporated as a general matter, this does not necessarily mean that each and every state rule must be adopted—federal courts should still reject specific state rules that are aberrant or hostile to federal interests. *See, e.g., Burks*, 441 U.S. at 479, 99 S.Ct. at 1837; *Johnson v. Railway Express Agency*, 421 U.S. 454, 465, 95 S.Ct. 1716, 1722, 44 L.Ed.2d 295 (1975); *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 596, 93 S.Ct. 2389, 2398, 37 L.Ed.2d 187 (1973); *DeSylva*, 351 U.S. at 580–81, 76 S.Ct. at 979–80; *Beaver County*, 328 U.S. at 210, 66 S.Ct. at 995.

■ Bearing these principles in mind, we find ourselves in agreement with the position of the United States, which appears in this action as amicus curiae, that a uniform federal rule should not be developed to govern the issue of whether and when agreements between private "responsible parties" can settle disputes over contribution rights under section 107. As the government points out, section 107(e)(1) expressly preserves agreements to insure, to hold harmless, or to indemnify a party held liable under section 107(a). Absent CERCLA, these contracts would be interpreted under state law. By preserving such agreements, Congress seems to have expressed an intent to preserve the associated body of state law under which agreements between private parties would normally be interpreted. Certainly federal courts need not fashion federal common law to interpret every settlement of liability that arises under federal statutes.

Admittedly, the Congressional intent on whether to fashion a uniform federal rule is not entirely clear. Reference to *Kimbell Foods'* three-part test, however, confirms our conclusion. First, we find no reason to think that the issue requires a uniform body of law. Commercial enterprises selling their assets or insuring themselves will normally look to state law to interpret their indemnification provisions, which will generally indemnify the enterprises against a whole host of possible liabilities. Disuniformity does not seem to impose any partic-

ular burden. The cases, cited by the dissent, that express a need for uniform rules of liability under section 107 are simply inapposite to the issue of whether the uniform rules are required for the interpretation of contractual agreements to indemnify for CERCLA liability.

Second, the application of state law to interpret such releases will not frustrate the objectives of CERCLA. Contractual arrangements apportioning CERCLA liabilities between private "responsible parties" are essentially tangential to the enforcement of CERCLA's liability provisions. Such agreements cannot alter or excuse the underlying liability, but can only change who ultimately pays that liability. Moreover, regardless of how or under what law these agreements are interpreted, the result cannot prejudice the right of the government to recover cleanup or closure costs from any responsible party, including either Mardan, Macmillan, or both. CERCLA § 107(a), 42 U.S.C. § 9607(a) (1982).

The dissent argues that the objectives of CERCLA might be frustrated because parties who inadvertently waive their right to cost-recovery will have less incentive to clean up hazardous waste. This "frustration" seems rather attenuated. First, as we have shown, all responsible parties will be fully liable to the government regardless of the indemnification contracts they have entered into. Second, even under the dissent's proposed federal rule of decision, a seller would be free to expressly require indemnification of CERCLA claims as a condition of sale and thus lessen the buyer's incentive to clean up waste to the same extent that a non-express waiver does. Thus, the dissent's proposed federal rule advances federal objectives only to the extent that those objectives depend upon suits by responsible parties who would inadvertently release their rights to cost-recovery and who are willing to risk possible suit by the government. Whether the frus-

tration of such an attenuated incentive is enough to overcome Congress' likely intent is doubtful. Moreover, there is nothing to suggest that New York law does not in fact attempt to fulfill the intentions of the parties to a release.[4]

■ The dissent's objections to the incorporation of state law seem to be based on an argument that we should adopt a prophylactic rule, requiring releases to explicitly refer to CERCLA, so that we can assure ourselves that there is no chance that parties may manifest an intention to waive their CERCLA claims by mistake or without thinking it through. *Dissent* at [1464]. Formulating such a federal rule to protect parties against their inadvertent waivers may well be appropriate where the rights waived are created by a federal statute that aims "at rectifying historical inequalities in bargaining power between parties," *Gamewell Mfg. v. HVAC Supply,* 715 F.2d 112, 114–16 (4th Cir.1983) (observing that the cases declining to borrow state law to determine the enforceability of releases of federal rights share this feature), or where there are other valid reasons to believe that the federal right at stake will be undermined by waivers obtained through ignorance or through unequal bargaining power. *See, e.g., Dice,* 342 U.S. at 361–62, 72 S.Ct. at 314 (federal rules govern releases of FELA rights by injured employees); *Salmeron,* 724 F.2d at 1361 (same for waiver of constitutional and civil rights claims); *Taber,* 648 F.2d at 1203 (same for § 1983 claims); *Parker v. DeKalb Chrysler Plymouth,* 673 F.2d 1178, 1180 (11th Cir.1982) (same for claims by car-buyer under the Truth-in-Lending Act); *Fulgence v. J. Ray McDermott & Co.,* 662 F.2d 1207, 1209 (5th Cir.1981) (same for employment discrimination claims under Title VII); *Ott v. Midland-Ross Corp.,* 523 F.2d 1367, 1368–69 (6th Cir.1975) (same for age discrimination claim).[5]

---

**4.** If parties have intentionally waived their right to cost-recovery, they have almost certainly received some form of consideration in exchange for their waiver that substitutes for the damages they could have otherwise collected.

**5.** Some courts seem to have mistakenly concluded that because federal law governs the release of all federal rights under *Dice v. Akron,* a uniform federal rule is required. *See, e.g., Locafrance U.S. Corp. v. Intermodal Systems Leas-*

By contrast, nothing in CERCLA suggests that it was intended to offer special protection to unwary purchasers of businesses. Moreover, since CERCLA releases are likely to be entered into by major companies, there is little need for a special federal rule to protect releasors of CERCLA recovery rights from their own ignorance or weak bargaining power.[6] In fashioning a statute to further a federal interest, Congress seldom if ever intends to pursue that interest at any cost. Rather Congress seeks to balance that interest against countervailing considerations, such as the utility of indemnification agreements, which it recognized in section 107(e)(1). " '[A] state statute cannot be considered "inconsistent" with federal law merely because the statute causes the plaintiff to lose the litigation.' " Burks, 441 U.S. at 479, 99 S.Ct. at 1837 (quoting Robertson v. Wegmann, 436 U.S. 584, 593, 98 S.Ct. 1991, 1996, 56 L.Ed.2d 554 (1978)).

Finally, we are convinced that application of a federal rule such as that advocated by the dissent would disrupt commercial relationships predicated on state law. The sale of any company normally involves the simultaneous transfer of several company-related claims. The claims released in this case for vacation and severance pay and for accounts receivable are illustrative. A seller will normally wish to wipe its slate clean, making some general release a condition of the sale so that the seller can relieve itself of the headaches as well as the benefits of the old business and move on to new ventures. And in doing so, sellers and buyers will normally turn to the extensive body of state law that governs the validity of the release of almost all their other claims. Creating a federal rule to govern CERCLA releases would introduce confusion and uncertainty into these commercial relationships in two respects. One, buyers and sellers would face greater confusion about which body of law to turn to. Two, the creation of a federal rule, as opposed to incorporating a ready-made and fully fleshed out body of state law, would, during the development of that federal rule, leave parties very uncertain about what rule governed CERCLA releases. It seems unlikely that there would have developed any immediate consensus among federal judges for the dissent's proposed rule or for any other. Absent some special reason to think that buyers of companies that deposit hazardous wastes are in need of our special solicitude and protection, we decline to fashion a federal rule that will undermine the stability of the state law generally governing such commercial transactions.

■ We thus hold that state law should provide the general content of federal law on the validity of releases of claims for cost-recovery under CERCLA. Because New York law on releases does not in any way appear to be aberrant or hostile to federal interests, we apply New York law in interpreting the Settlement Agreement and the Release.[7]

### III

Mardan argues that, under New York law, the district court erred in granting Macmillan's motion for summary judgment because a disputed issue of material fact exists as to whether the parties intended to include potential CERCLA claims within the terms of the Settlement Agreement and the Release. Mardan argues that extrinsic

---

ing, 558 F.2d 1113, 1115 (2d Cir.1977); Twentieth Century-Fox Film Corp. v. Winchester Drive-In Theatre, 351 F.2d 925, 928 (9th Cir.1965). After Kimbell Foods, at least, it is clear that the issue of whether federal law governs is distinct from the issue of whether the content of the federal rule should be determined by state law or by the formulation of a uniform federal rule. 440 U.S. at 727, 99 S.Ct. at 1457.

6. Even if inadvertent waivers were a concern, the underlying federal interest in cleanup would not be undermined in the same way as the federal interest in protecting rights could have been in the cases above because the threat of governmental suit would still serve as an incentive to clean up. Cf. Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 891–92 (3d Cir. 1975).

7. It is not disputed that, if governed by state law, the contract issues are governed by New York law.

evidence shows that the parties did not contemplate that the Settlement Agreement or the Release would cover the costs of cleaning up and closing the waste disposal site. Mardan cites three affidavits to the effect that closure and cleanup of the settling pond and land treatment site "were not discussed at all as any part of negotiations leading to the 1981 settlement agreement." Affidavit of Joseph D. Sharp, ¶ 8; *see also* Affidavit of William D. Price ¶¶ 5–6; Affidavit of Daniel J. Henkin ¶ 4. In addition, Henkin, Chairman and President of Mardan, attested that Mardan made no claim against Macmillan for closure or cleanup costs at the time the Settlement Agreement and the Release were negotiated.

The only extrinsic evidence proffered by Macmillan is the affidavit of William A. Naughton, a Vice President of Macmillan, who recalled that during the negotiations Mardan raised the issue of payments for a potential "effluent disposal" liability at the Nogales plant. Specifically, Mardan requested $112,000 from Macmillan for "corrective action" which might be necessary at the Nogales settling pond. This question apparently remained open for several months until Mardan, just one month before the Settlement Agreement and the Release were executed, dropped its request for reimbursement for "potential effluent disposal liability." Affidavit of William A. Naughton ¶¶ 7–10. Mardan responds that the "effluent disposal liability" claim did not refer to the possibility of closure and cleanup of the waste disposal site, but referred only to the possibility that a waste pretreatment plant would be required in order to operate the settling pond in conformity with RCRA.

The district court rejected Mardan's contract interpretation theory, reasoning that the Release's broad language—"[all claims] arising out of or in any way relating to the Purchase Agreement"—encompassed Mardan's claim against Macmillan under section 107 in light of several undisputed facts: First, the parties knew of the existence of the settling pond and the hazardous nature of its contents. Second, the parties

specifically addressed the possibility that corrective action would be required under RCRA. Finally, CERCLA had been in existence for nearly a year at the time the Settlement Agreement and the Release were executed. In light of these undisputed facts, the district court ruled that, "given the broad and unambiguous language of the general release involved in this case, it must be concluded that Mardan intended to give up all claims which it had or might someday have against C.G.C. and Macmillan in exchange for approximately $995,000." 600 F.Supp. at 1057.

We find no error in the district court's interpretation of the scope of the Settlement Agreement and the Release in light of the proffered extrinsic evidence. Mardan misconstrues the extent to which a releasor may avoid the effect of a general release under New York law. Mardan correctly notes that New York courts may "avoid such a release despite the generality of the release form." *Mangini v. McClurg*, 24 N.Y.2d 556, 562, 301 N.Y.S.2d 508, 513, 249 N.E.2d 386, 389–90 (1969) (citations omitted). Mardan also correctly points out that the scope of a release generally depends on "the controversy being settled, and the purpose for which the release is actually given." *Cahill v. Regan*, 5 N.Y.2d 292, 157 N.E.2d 505, 509–10, 184 N.Y.S.2d 348 (1959). Mardan, however, provides insufficient support for its contention that the controversy settled by the Settlement Agreement and the Release related solely to certain discrete accounting issues. Mardan's position is belied by the very terms of both documents. The Settlement Agreement not only absolved Macmillan from liability for claims "based upon or arising out of the Purchase Agreement," it released Macmillan from all claims "in any way connected" with the Purchase Agreement "or with the transactions contemplated thereby." The Release reiterated that Macmillan was released from liability for all claims "based upon, arising out of or in any way relating to the Purchase Agreement." Moreover, the Settlement Agreement states that

certain other claims have been asserted by [Mardan] and Macmillan, each against the other, based upon or arising out of the Purchase Agreement, and the transactions contemplated therein; and the parties are desirous of settling all the aforesaid claims *and any other issues between them.* (emphasis added).

Thus, the language of both the Settlement Agreement and the Release clearly indicate that the parties intended to settle more than certain discrete accounting issues. This conclusion is further bolstered by the fact that only $213,944 of the $955,000 paid by Macmillan for the Release related to the specific claims referred to by Mardan. Another $781,055 was paid to Mardan for Macmillan's release from "other claims asserted under the Purchase Agreement." It is clear that the negotiations leading up to the Settlement Agreement and the Release were not limited to accounting issues, but encompassed a wide variety of disputes relating to the Purchase Agreement, including a claim that defendants should contribute to a waste pretreatment plan which would enable the settling pond to conform to RCRA. Thus, the language releasing Macmillan from all claims by Mardan "based upon, arising out of or in any way relating to the Purchase Agreement" cannot, under its own terms, or through reference to Mardan's proffered extrinsic evidence, be limited to exclude Mardan's section 107 claim, which certainly resulted from its acquisition of the property from Macmillan.[8]

A variation on Mardan's contract interpretation argument is that it was actually entitled to summary judgment itself under New York law because Macmillan failed to satisfy its burden of persuasion because it presented no evidence that the Release was intended to encompass closure and cleanup of the waste disposal site. Because we disagree with Mardan that a release has such a burden under New York law, *see Mangini v. McClurg,* 24 N.Y.2d 556, 563, 301 N.Y.S.2d 513–14, 249 N.E.2d 386, 390 (1969) ("[r]eleasor ... must sustain the burden of persuasion if he is to establish that the general language of the release ... is to be limited ..."), we reject this claim.

Finally, Mardan makes an argument that the Release should be disregarded in its action for damages under section 107 of CERCLA because it was based upon a mutual mistake of fact, namely the parties were unaware that Mardan would be required to clean up and close the waste disposal site. While New York law generally supports this legal theory, *see Mangini v. McClurg,* 24 N.Y.2d at 563, 301 N.Y.S.2d at 513, 249 N.E.2d at 390, it makes a sharp distinction between "injuries unknown to the parties and mistake as to the consequence of a known injury." *Id.* at 564, 301 N.Y.S.2d at 514–15, 249 N.E.2d at 391. "A mistaken belief as to the nonexistence of a presently existing injury is a prerequisite to avoidance of a release." *Id.,* 301 N.Y.S.2d at 515, 249 N.E.2d at 391. In this

---

8. Mardan finally argues that the Settlement Agreement and the Release apply only to claims brought pursuant to the Purchase Agreement, not to an independent CERCLA action for response or removal costs, which it claims does not rest, and does not depend, on the existence of any contract, including the 1980 Purchase Agreement. We agree with the district court that this argument lacks merit. Mardan's claim arises directly from the Purchase Agreement which gave Mardan ownership of the Nogales facility. As the district court said:

If Mardan had not acquired an ownership interest in the property by virtue of the Purchase Agreement, it would not have incurred "response costs" pursuant to the EPA Consent Agreement and Final Order and would not have acquired a cause of action under Section

107(a) of CERCLA. The fact that Mardan could have acquired title to the property "in the absence of any purchase agreement whatsoever" is irrelevant. It *was* the Purchase Agreement in this case that transferred title to the Nogales facility to Mardan.

600 F.Supp. at 1056. Given the breadth of the Settlement Agreement, absolving Macmillan from liability for any claims "in any way connected with" the Purchase Agreement, and noting that "the parties are desirous of settling ... any other issues between them," and given the absence of any extrinsic evidence that the parties intended a more limited release, we cannot accept Mardan's argument that potential CERCLA claims were not included within the meaning of the Settlement Agreement and the Release.

case, however, the parties knew that some corrective action would have to be taken to bring the settling pond into compliance with RCRA. Further, as the district court noted, they had constructive knowledge of CERCLA, and of the RCRA closure regulations. 600 F.Supp. at 1057; *see also State ex rel. Abrams v. Solil Management Corp.*, 128 Misc.2d 767, 491 N.Y.S.2d 243 (1985) (unless contract states otherwise, the law in force at the time the contract was executed becomes a part of the agreement because it is presumed that the parties were aware of the law when the agreement was made). It makes no difference that the required corrective action turned out to be cleaning up and closing the pond rather than building a waste pretreatment facility, because under New York law, "[i]f the injury is known, and the mistake … is merely as to the consequence, future course, or sequelae of a known injury, then the release will stand." *Mangini*, 24 N.Y.2d at 564, 301 N.Y.S.2d at 515, 249 N.E.2d at 391. Thus, given the fact that both parties were aware of the potential for incurring "response costs" under RCRA, Mardan cannot now complain that the nature and extent of those costs were unanticipated.

Finally, the Settlement Agreement as well as the accompanying Release firmly evidences the parties' intent to end their various disputes over the Nogales facility once and for all. The Settlement Agreement recites that "the parties are desirous of settling all the aforesaid claims *and any other issues between them.*" (emphasis added). Mardan has presented no evidence that would justify a construction of this clear language as anything other than a bargaining for "general peace." Under New York law, "[w]hen general peace is the consideration [for a release] there can be no mutual mistake as to the extent of the injuries, known or unknown." *Mangini*, 24 N.Y.2d at 566, 301 N.Y.S.2d at 516, 249 N.E.2d at 392.

AFFIRMED.

REINHARDT, Circuit Judge, dissenting:

I dissent from the majority's holding that state law should be incorporated as the federal rule of decision governing the release of claims under section 107 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA or the Act), 42 U.S.C. §§ 9601–57 (1982), and from its affirmance of the grant of summary judgment in favor of Macmillan. I would adopt a uniform federal rule that a release of a CERCLA claim must be express. Because Mardan did not expressly release its CERCLA claim, I would reverse the grant of summary judgment in favor of Macmillan and award partial summary judgment to Mardan.

While recognizing that federal law governs the validity of a release of federal causes of action, the majority incorporates state law as the federal rule of decision because in its view (1) it is not clear whether Congress intended federal courts to develop a uniform federal standard or to incorporate state law, and (2) a federal rule is inappropriate as matter of judicial policy under the three-part test established in *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). I think that Congress did express its preference for development of uniform federal rules. At the very least, the fact that federal law governs here creates a presumption against incorporation of state law in the absence of convincing justification. In any case, adopting a uniform federal rule is warranted under the *Kimbell Foods* test.

In assessing congressional intent, the majority claims that section 107(e), by permitting agreements to insure, hold harmless or indemnify CERCLA liabilities, evinces the intent of Congress to incorporate state law governing such agreements. Majority at 1458. That Congress provided for these agreements in section 107(e)(1) in no way implies that Congress intended that state law govern. On the contrary, it seems fair to assume that Congress, having failed expressly to incorporate state law, intended that releases of CERCLA

claims be construed under federal law like all other CERCLA claims and defenses.

The majority's argument also overlooks the fact that Congress preserved CERCLA claims arising "by reason of subrogation or otherwise" in section 107(e)(2). The courts that have considered the issue thus far have unanimously held that this provision makes available joint and several liability under the Act, and that both the policy and legislative history of CERCLA necessitate the formulation of uniform federal rules of liability under section 107. *E.g., Wehner v. Syntex Agribusiness, Inc.,* 616 F.Supp. 27 (E.D.Mo.1985); *Colorado v. Asarco, Inc.,* 608 F.Supp. 1484 (D.Colo.1985); *United States v. A & F Materials Co., Inc.,* 578 F.Supp. 1249 (S.D.Ill.1984); *United States v. Ward,* 22 E.R.C. 1235 (E.D.N.C.1984); *United States v. Chem-Dyne Corp.,* 572 F.Supp. 802 (S.D.Ohio 1983). Were the majority correct that Congress, by providing in section 107(e)(1) for a right or claim that has a state law counterpart, intended that state law govern that right or claim, then the courts that have addressed the right of contribution under section 107(e)(2) should at the very least have begun their choice of law analysis with the presumption that state law should control. No court in fact has done so.

The majority does not analyze the legislative history of the Act. In enacting CERCLA, Congress established a nationwide regulatory scheme in order to ensure rapid responses to the threats posed by improperly managed hazardous waste sites, to encourage the voluntary clean-up of those sites, and to make certain that those responsible for the problems bear the costs of clean-up. 5 U.S.Code Cong. & Ad.News 6119, 6119–20, 6132 (1980); *Chem-Dyne,* 572 F.Supp. at 805–06. Representative Florio, CERCLA's House sponsor, specifically addressed the question of uniformity: "To insure the development of a uniform rule of law, and to discourage business[es] dealing in hazardous substances from locating primarily in states with more lenient laws, the bill will encourage the further development of a Federal common law in [the CERCLA liability] area

of law." 126 Cong.Rec. H11787 (daily ed. Dec. 3, 1980). Although some difference exists between the establishment of CERCLA liability and the release of a CERCLA right of action, a uniform federal rule regarding releases from CERCLA liability serves Congress' goals in the same manner that a uniform rule regarding liability does. Thus section 107 itself, the case law interpreting the Act, and its legislative history all support the conclusion that a uniform federal rule should govern releases of CERCLA claims.

Even assuming that congressional intent may be unclear, an analysis of the federal and state interests in the application of their own law to alleged releases of CERCLA claims also demonstrates that we should adopt a uniform federal rule here. Under *Kimbell Foods,* this analysis requires determining (1) whether there is a need for a uniform body of law to govern like situations, (2) whether application of state law would frustrate federal policy, and (3) whether the application of a federal rule would disrupt existing relationships predicated on state law. *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 727, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979); *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 672–73, 99 S.Ct. 2529, 2540, 61 L.Ed.2d 153 (1979).

The majority does not see any reason to require a uniform body of law. Majority at 1458. However, the part of its analysis addressed to that question looks at the issue only from the perspective of hazardous waste operators and not from that of the public interest. As just discussed, the need for national uniformity in dealing with hazardous waste sites was an express factor underlying the passage of CERCLA. Uniformity with respect to releases from CERCLA liability is necessary to prevent the vagaries of differing state laws from affecting the incentive for voluntary clean-up. That incentive may well be eliminated when an operator has inadvertently waived its right of cost recovery. The majority concludes that this problem is an attenuated one by comparing the federal rule I

propose to its own alternative of incorporating state law. The majority's analysis confuses the question of whether a uniform federal rule should apply, which must focus on the need for uniformity and its possible effects, with the question of what is an appropriate uniform rule. In answering the former question, it is clear that Congress enacted CERCLA to ensure a uniformly rapid response to hazardous waste sites nationwide. To dilute uniformity even to a small degree seems to me to contravene that purpose.

The application of state law could well frustrate the Act's specific objective of guaranteeing a rapid response when a hazardous waste clean-up becomes necessary. Ordinarily, the current operator of the site is the party best able to respond quickly and efficiently in such a situation and to perform or arrange for the clean-up, even if it did not create the problem. The CERCLA right of cost recovery encourages the current operator to move swiftly and then obtain contribution from other responsible parties. If, because of the application of state law to a release, the current operator inadvertently loses its CERCLA right of cost recovery, it will also lose its incentive to undertake a voluntary response. Without the ability to require contribution from other responsible parties, the current operator may prefer to wait and let the government perform the work. In such case the government can apportion its costs among *all* the responsible parties and the current operator would be required to pay only its share instead of all the costs.

The majority asserts that interpreting CERCLA releases under state law does not conflict with the goals of the Act because of the government's option to respond and allocate costs. Majority at 1458–59. This argument is incorrect for two reasons. First, it overlooks a serious practical problem. While the government can, in theory, undertake the necessary work and obtain reimbursement from all responsible parties

whenever clean-up of hazardous waste sites is required, its ability to monitor the numerous sites and initiate clean-up operations on a nationwide basis is severely constrained by the limited availability of human and budgetary resources.[1] Second, while in some instances the government may ultimately perform the job and recover its response costs, under the statutory scheme government clean-up is a last resort and occurs only after there is a failure of voluntary private action. It is voluntary private action that the statute seeks to achieve and it is swift and immediate voluntary private action that would be jeopardized by the application of state law. *See* 5 U.S.Code Cong. & Ad.News 6119, 6120, 6132 (1980).

Contrary to the majority's view, application of a uniform federal rule would not disrupt existing relations predicated on state law. CERCLA is a federal program of national scope, without antecedent in state law. Private parties would not be surprised by the fact that federal law governs their rights under the Act, especially in light of the established rule that federal law governs federal releases. Moreover, as the majority correctly points out, most CERCLA releases are likely to be entered into by major companies, Majority at 1460; accordingly, there is little cause to worry that the parties will mistakenly think that state law governs. The majority also argues that a uniform federal rule governing CERCLA releases would cause greater confusion as to the law applicable in commercial transactions involving hazardous waste facilities because the parties will normally turn to state law. Majority at 1460. This argument simply overlooks the fact that, as pointed out above, other parts of CERCLA transactions must be construed in light of federal law. Thus, irrespective of which rule governs CERCLA releases, documents covering transactions of the type involved here *must* be prepared in light of applica-

---

1. As Chief Justice Burger noted in his opinion for the Court invalidating section 251 of the Gramm-Rudman Act, "[n]o one can doubt that Congress and the President are confronted with fiscal and economic problems of unprecedented magnitude." *Bowsher v. Synar*, —— U.S. ——, 106 S.Ct. 3181, 3193, 92 L.Ed.2d 583 (1986).

ble federal law. Given the need for uniformity, the potential harm to federal interests and the absence of any disruption of commercial relations, I would hold that the adoption of a uniform federal rule regarding CERCLA releases is called for.

The standard developed by the courts for the release of other federal causes of actions is appropriate for a release of a CERCLA claim. In *Jones v. Taber*, 648 F.2d 1201, 1203 (9th Cir.1981), we held that a "release of claims under [42 U.S.C.] section 1983 is valid only if ... voluntary, deliberate, and informed." We adopted the standard that the releasor must be shown to have "understood the nature of whatever statutory and common-law remedies he waived by the release." *Id.* (citing *Charpentier v. Fluor Ocean Services, Inc.*, 613 F.2d 81, 84 (5th Cir.1980) (after remand)). In applying that standard, we have held that the release of certain federal rights must be express. *Salmeron v. United States*, 724 F.2d 1357, 1361 (9th Cir.1983); *Parker v. DeKalb Chrysler Plymouth*, 673 F.2d 1178, 1182 (11th Cir.1982).

In my view, the release of a CERCLA claim should also be express. With the enactment of CERCLA, Congress established a national policy mandating the speedy clean-up of hazardous waste sites, preferably by voluntary private action, and the apportionment of the costs of clean-up to those responsible for the problems. While Congress permitted private agreements to modify apportionment in particular instances, the release of CERCLA claims should not be lightly implied; to do otherwise would frustrate the congressional intent behind CERCLA. Thus, in construing an agreement purporting to waive CERCLA rights, a court should find a waiver only where it is clear that the releasor intends to release its CERCLA rights. A general release that fails to refer explicitly to the Act does not suffice.

Applying the standard set forth above, I would reverse the grant of summary judgment in favor of Macmillan and direct that partial summary judgment be entered in favor of Mardan.