ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY; Southern Pacific Transportation Company, a Delaware corporation, Plaintiffs–Appellants,

v.

BROWN & BRYANT, INC., Defendant,

and

PureGro Company, a California corporation, Defendant–Appellee.

No. 96–15529.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 8, 1997.

Decided Dec. 30, 1997.

Robert M. Lichtman, Banchero & Lasater, San Francisco, California, for plaintiffs-appellants.

Francis J. Balint, Jr., Bonnett, Fairbourn, Friedman & Balint, Phoenix, Arizona, April V. Pearson, Brea, California, and Diane E. Shell, of Shell & Associates, Roseville, California, on the brief, for defendant-appellee.

Jerry L. Anderson and Gregory C. Sisk, Drake University Law School, Des Moines, Iowa, for the amicus curiae.

Before: HUG, Chief Judge, GOODWIN and HAWKINS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

The Atchison, Topeka & Santa Fe Railway Company and Southern Pacific Transportation Company (the "Railroads") are responsible parties under CERCLA[1] for soil contamination on property they leased to Brown & Bryant ("B & B"), an agricultural chemical company. The Railroads brought this action against PureGro, a B & B competitor that purchased many of B & B's assets, alleging that PureGro is the successor-in-interest to B & B and thus liable for contribution to the Railroads under CERCLA.

In this appeal, the Railroads ask us to exercise our powers under federal common law to expand successor corporate liability under CERCLA. PureGro, on the other hand, would have us reexamine existing Ninth Circuit precedent in light of intervening Supreme Court decisions and hold that there is no need for a federal common law of successor liability under CERCLA, and that state law supplies the rule of decision in this area. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court's grant of summary judgment in favor of PureGro.

## Facts

B & B operated an agricultural chemical business on property it owned and on adjacent property it leased from the Railroads. B & B was a family enterprise, whose sole shareholder was John Brown. By the mid-1980's, two B & B sites were under investigation by California and federal environmental agencies. When B & B could not complete cleanup activities by itself, the Environmental Protection Agency ("EPA") issued an Administrative order to the Railroads, requiring them as owners of parts of the sites to undertake response activities. By 1988, Brown realized B & B could not afford to comply with agency cleanup orders and decided to sell his business. B & B retained a broker, who had B & B's property appraised and then contacted a number of B & B's competitors in the area, including PureGro.

Paying the appraised value for the equipment, PureGro bought about half of B & B's equipment pursuant to an Equipment Sale Agreement. The agreement specified that it was not to be construed as a purchase of B & B's business and that PureGro would not be considered de jure or de facto a successor to B & B. The Equipment Sale Agreement also included environmental indemnity provisions and conditioned the transaction on obtaining a release from the EPA and the California Department of Health Services, absolving PureGro from any environmental liability. Ultimately, this release was not available, but PureGro decided to close the deal nonetheless.

In a second agreement, PureGro purchased tanks and trailers from Brown that had been used by B & B but owned individu-

1. The Comprehensive Environmental Response, Compensation and Liability Act of 1980.

ally by Brown and his ex-wife. PureGro paid the appraised value for this equipment as well. Finally, there was a Consulting Agreement between PureGro and Brown, in which PureGro retained Brown to help acquire and maintain the prior B & B customers and to assist in soliciting new business for PureGro.

PureGro hired all of B & B's Pest Control Advisors ("PCAs"). PCAs work closely with farmers and develop a close client relationship, so that most farmers buy their chemicals from the retailer with whom the PCA is affiliated. In total, PureGro employed about 60% of the employees who were still left at B & B in 1988. Neither Brown nor any of the B. & B employees were given management positions or stock ownership in PureGro. PureGro did not acquire any interest in B & B's accounts receivable or existing contracts with suppliers or customers. For a short while after the asset sale, B & B continued to run a dry fertilizer operation, and PureGro occasionally purchased fertilizer from B & B, by purchase order.

Post-transaction, PureGro took over B & B's phone numbers. Brown sent a letter to his mailing list explaining that he had accepted a position with PureGro and that PureGro would "employ our personnel, lease our equipment and service your account in the tradition you have come to expect." The local paper carried an article entitled "Brown and Bryant, PureGro join" accompanied by a photo of Brown shaking hands with PureGro's president in front of two trucks bearing the logo of the two companies.

The Railroads sued PureGro as B & B's successor-in-interest, seeking private cost recovery, contribution and declaratory relief under CERCLA and numerous state claims. The Railroads recognized the rule that asset purchasers do not ordinarily incur successor liability, and thus sought to impose liability on PureGro under two exceptions to this general rule: the "fraudulently-entered transaction" exception, and the "continuing business enterprise" exception (also called the "substantial continuation" exception). In an extension of this circuit's law, the district court applied the continuing business enterprise exception, but found that, as a matter of law, the exception was inapplicable to the

facts of this case and granted summary judgment to PureGro on that exception. As to the fraudulent transaction exception, the district court noted that there was no evidence that PureGro purchased B & B's "clean" assets for insufficient consideration, and granted summary judgment to PureGro on this exception as well. The Railroads appeal.

## Standard of Review

A grant of summary judgment is reviewed de novo. *Bagdadi v. Nazar,* 84 F.3d 1194, 1197 (9th Cir.1996).

## Discussion

### I. The Current State of Successor Liability Under CERCLA

In *Louisiana–Pacific Corp. v. Asarco, Inc.,* 909 F.2d 1260 (9th Cir.1990), we adopted the Third Circuit's rationale that CERCLA authorizes successor liability and that the parameters of this successor liability are to be fashioned by federal common law. *Id.* at 1262–63 (citing *Smith Land & Improvement Corp. v. Celotex Corp.,* 851 F.2d 86, 91–92 (3d Cir.1988)). We then went on to create federal common law rules of successor liability by drawing on the traditional rules of successor liability in operation in most states. *Louisiana–Pacific,* 909 F.2d at 1263. Thus, we recognized that asset purchasers are not liable as successor corporations unless:

(1) The purchasing corporation expressly or impliedly agrees to assume the liability;

(2) The transaction amounts to a "de-facto" consolidation or merger;

(3) The purchasing corporation is merely a continuation of the selling corporation; or

(4) The transaction was fraudulently entered into in order to escape liability.

*Id.*

In this case, the Railroads concede that the first three exceptions do not apply to PureGro. Rather, the Railroads contend that PureGro is liable under the fraudulently-entered transaction exception (discussed in Part III, below) or that PureGro is liable under a broader deviation of the "mere con-

tinuation" exception, sometimes referred to as the "substantial continuation" or the "continuing business enterprise" exception. *Louisiana–Pacific* specifically left open the availability of this broader exception, *id.* at 1266, and the exception has not since been adopted in this circuit.

 At this juncture, the "federal common law" rules for successor liability under CERCLA in this circuit mirror the traditional successor liability rules of most states, including California. (California law applies to the contracts between PureGro and B & B.) The Railroads would have us exercise our powers under federal common law to expand CERCLA liability by adding an additional successor liability exception, which, they contend, would encompass PureGro as a successor-in-interest to B & B. PureGro, however, argues that this expansion under federal common law is not permissible, as recent Supreme Court decisions have undermined *Louisiana–Pacific's* holding that federal common law governs successor liability under CERCLA.[2] Although we are normally bound by the decisions of prior panels, where an intervening Supreme Court decision "closely on point" sufficiently undermines the panel holding, a three-judge panel may reexamine and overturn a previous panel's decision. *United States v. Gay*, 967 F.2d 322, 327 (9th Cir.1992).

## II. Revisiting Louisiana–Pacific

PureGro makes a persuasive argument that the Supreme Court's decisions in *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), and *Atherton v. FDIC*, —— U.S. ——, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997), call into question the ease with which *Louisiana–Pacific* created a set of federal rules for successor liability under CERCLA. Although *O'Melveny* and *Atherton* involve a different federal statute, the underlying analysis is applicable in any situation in which it is necessary to determine whether state law should be supplanted by judicially created federal rules of decision.

These cases counsel that the need for such special federal rules will be only in "few and restricted" instances. *Atherton*, —— U.S. at ——, 117 S.Ct. at 673; *O'Melveny*, 512 U.S. at 87, 114 S.Ct. at 2055. *Atherton* and *O'Melveny* also clarify the heavy burden that a party bears in proving the need for uniformity or proving that state rules conflict with federal policy. *See, e.g., Atherton*, —— U.S. at ——·——, 117 S.Ct. at 671–74; *O'Melveny*, 512 U.S. at 87–88, 114 S.Ct. at 2055–56. Indeed, in these cases, the Court rejected many of the very arguments that *Louisiana–Pacific* accepted in deciding CERCLA necessitated a set of uniform federal rules for successor liability.

This circuit recognizes that simply because a federal statute is involved "does not always mean that federal courts should fashion a uniform federal rule.... Frequently, state rules of decision will furnish an appropriate and convenient measure of the governing federal law." *Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1457–58 (9th Cir. 1986). In *Mardan*, we explained that when dealing with a federal statute, a court should first look to see "whether Congress intended federal judges to develop their own rules or to incorporate state law." *Id.* at 1458. If there is no "congressional directive," then a court should turn to the three-part test articulated in *United States v. Kimbell Foods*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), to determine whether "formulating a federal rule would be appropriate as a matter of judicial policy." *Mardan*, 804 F.2d at 1458.

In *Louisiana–Pacific*, we agreed with the Third Circuit that CERCLA's "meager legislative history available indicates Congress expected the courts to develop a federal common law to supplement the statute." 909 F.2d at 1263 (quoting *Smith Land*, 851 F.2d at 91). This legislative history consists of a discussion in Congress that common law should govern the issue of joint and several liability under CERCLA. *See United States v. Chem–Dyne Corp.*, 572 F.Supp. 802, 806–07 (S.D.Ohio 1983). *Louisiana–Pacific* rec-

---

**2.** PureGro raises this argument for the first time on appeal. Although we do not have to entertain it, we exercise our discretion to do so since it is a purely legal question of considerable signifi-

cance. *See Botefur v. City of Eagle Point, Or.*, 7 F.3d 152, 155 (9th Cir.1993) (considering for the first time on appeal whether state or federal law applies).

ognized that Congress did not address the particular issue of successor liability under CERCLA. 909 F.2d at 1263.

O'Melveny tells us that when dealing with a "comprehensive and detailed" federal statutory regulation, a court should instead presume that matters left unaddressed in such a scheme are subject to state law. *See* 512 U S. at 85, 114 S.Ct. at 2054. "Congress acts ... against the background of the total *corpus juris* of the states...." *Atherton,* —— U.S. at ——, 117 S.Ct. at 670 (quoting *Wallis v. Pan American Petroleum Corp.* 384 U.S. 63, 68, 86 S.Ct. 1301, 1304, 16 L.Ed.2d 369 (1966)) (alteration in the original). The formation of corporations and the dissolution and continuing liability of corporations are traditional areas of state law. As CERCLA lacks any clear directive that federal courts develop standards for successor liability, we turn to the *Kimbell Foods* test, as clarified by *O'Melveny* and *Atherton.*

■ The *Kimbell Foods* considerations are: whether federal interests require a nationally uniform body of law, whether application of state law would frustrate or conflict with specific objectives of federal programs, and the extent to which application of a federal rule would disrupt commercial relationships predicated on state law. *Kimbell Foods,* 440 U.S. at 728–29, 99 S.Ct. at 1458–59. *Louisiana–Pacific* addresses the first two *Kimbell Foods* concerns in a footnote about "the need for national uniformity in the successor liability area" and "the possibility that CERCLA's purposes could be frustrated by state law" if a state law unduly limited successor liability, thus cutting off the EPA's ability to seek compensation. 909 F.2d at 1263 n. 2. *O'Melveny* and *Atherton* indicate more is required.

Although *Louisiana–Pacific* refers to the "need for national uniformity" as a reason for developing federal rules for successor liability, 909 F.2d at 1263 n. 2, *Atherton* notes that "[t]o invoke the concept of 'uniformity' ... is not to prove its need." —— U.S. at ——, 117 S.Ct. at 671; *see also O'Melveny,* 512 U.S. at 87, 114 S.Ct. at 2055 (recognizing how generic and "lightly invoked" is the need for uniformity). Although often invoked in this context,[3] there has been no real explanation of the need for uniformity in the particular area of successor liability—especially since state law will in many other instances determine whom the EPA may or may not look to for compensation. *See, e.g., Levin Metals Corp. v. Parr–Richmond Terminal Co.,* 817 F.2d 1448, 1451 (9th Cir.1987)(California law determines capacity of a dissolved corporation to be sued); *Mardan,* 804 F.2d at 1458–60 (state law determines validity of contractual releases of CERCLA liability). If state law varied widely on the issue of successor liability, perhaps the need for a uniform federal rule would be more apparent. This is not the case, however, as "the law in the fifty states on corporate dissolution and successor liability is largely uniform." *Anspec Co. v. Johnson Controls, Inc.,* 922 F.2d 1240, 1249 (6th Cir.1991) (Kennedy, J., concurring) (holding that state law determines successor liability under CERCLA).[4] The argued "need" for uniformity thus stems not from disarray among the various states, but from the alleged need for a more expansive view of successor liability than state law currently provides—in other words, the notion that state law on this issue is inadequate for CERCLA's purposes.

■ But *O'Melveny* and *Atherton* also speak to this argument. Before a court can

3. *See, e.g., B.F. Goodrich v. Betkoski,* 99 F.3d 505, 519 (2d Cir.1996); *Smith Land,* 851 F.2d at 92.

4. We also note that while state law on successor liability is well-developed and uniform, the courts that have attempted to fashion federal common law rules for successor liability under CERCLA have created conflicts and uncertainties over a number of issues, including whether to adopt the expanded "continuity of enterprise" theory (*compare United States v. Carolina Transformer Co.,* 978 F.2d 832, 838 (4th Cir.1992), *with John S. Boyd Co. v. Boston Gas Co.,* 992 F.2d 401, 408 (1st Cir.1993)); the importance of the purchaser's knowledge of the seller's CERCLA liabilities (*compare United States v. Atlas Minerals & Chemicals, Inc.,* 824 F.Supp. 46, 50 (E.D.Pa.1993), *with Atlantic Richfield Co. v. Blosenski,* 847 F.Supp. 1261, 1287 (E.D.Pa.1994)); and whether continuity of ownership is a prerequisite to successor liability (*compare Sylvester Bros. Dev. Co. v. Burlington Northern R.R.,* 772 F.Supp. 443, 448 (D.Minn.1990), *with Diaz v. South Bend Lathe Inc.,* 707 F.Supp. 97, 101 (E.D.N.Y.1989)).

recognize a federal rule of decision, there must be a " 'significant conflict between some federal policy or interest and the use of state law.' " *O'Melveny,* 512 U.S. at 87, 114 S.Ct. at 2055 (quoting *Wallis,* 384 U.S. at 68, 86 S.Ct. at 1304). Indeed, such a conflict is a "precondition" to fashioning federal common law rules. *Atherton,* —— U.S. at ——, 117 S.Ct. at 670. The Court's recent cases clarify that to demonstrate such a conflict, more than speculation is required—there must be a "specific, concrete federal policy or interest that is compromised" by the application of state law. *O'Melveny,* 512 U.S. at 87, 114 S.Ct. at 2055. We therefore doubt that the concern noted in *Louisiana–Pacific* is sufficient grounds for developing a federal rule of decision. *See Louisiana–Pacific,* 909 F.2d at 1263 n. 2.

CERCLA "provides a mechanism for cleaning up hazardous-waste sites ... and imposes the costs of the cleanup on those responsible for the contamination." *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 7, 109 S.Ct. 2273, 2277, 105 L.Ed.2d 1 (1989). There is no evidence that the application of state corporation law will frustrate this objective. No state provides a haven for liable companies. Nor is there reason to think that states will alter their existing successor liability rules in a "race to the bottom" to attract corporate business. *See Anspec,* 922 F.2d at 1250 (Kennedy, J. concurring). States have their own interest in ensuring that successor corporations do not evade liability—successor liability rules were, after all, developed to address much more than environmental liability. It is unrealistic to think that a state would alter general corporate law principles to become a peculiarly hospitable haven for polluters.

Since states already have rules in place to prevent the use of the corporate form to avoid liability, the only possible justification for a new, federal (and more expansive) rule is to "enrich the fund" by imposing liability on more asset purchasers. *Cf. O'Melveny,* 512 U.S. at 87, 114 S.Ct. at 2055. *See, e.g., Smith Land,* 851 F.2d at 91 ("The costs associated with cleanup must be absorbed somewhere."). As the Court pointed out in *O'Melveny,* these "more money" arguments

are unavailing. 512 U.S. at 87, 114 S.Ct. at 2055; *see also Kimbell Foods,* 440 U.S. at 737–38, 99 S.Ct. at 1463–64.

■ *O'Melveny* and *Atherton* reaffirm the *Kimbell Foods* analysis and clarify the difficulty of proving the need for a federal rule of decision. The imposition of liability under any statute "involves a host of considerations that must be weighed and appraised.... Within the federal system, at least, we have decided that that function of weighing and appraising is more appropriately for those who write the laws, rather than for those who interpret them." *O'Melveny,* 512 U.S. at 88, 114 S.Ct. at 2056 (internal citations and quotations omitted). While we are reluctant to question the essential holding of *Louisiana–Pacific, O'Melveny* and *Atherton,* intervening decisions by the Supreme Court, squarely refute the wisdom of fashioning a federal common law on this issue. If not, state law—in this case, California law—provides the rule of decision, and PureGro could not be liable under the "substantial continuation" exception, since California, like most states, does not recognize this exception. *Phillips v. Cooper Laboratories, Inc.,* 215 Cal.App.3d 1648, 264 Cal.Rptr. 311, 315 (1989).

■ Although we determine that state law dictates the parameters of successor liability under CERCLA, we would reach the same result under federal common law that California has reached under state law, because we would not adopt the "substantial continuation" exception in this circuit. *Louisiana–Pacific* recognized that "the traditional rules of successor liability in operation in most states" should determine the limits of CERCLA successor liability. 909 F.2d at 1263; *see also John S. Boyd Co. v. Boston Gas Co.,* 992 F.2d 401, 408 (1st Cir.1993) (identifying four traditional exceptions to non-liability of asset purchasers). As discussed above, these traditional rules are adequate to protect CERCLA's goal of obtaining cleanup costs from responsible parties.

Furthermore, we believe altering the traditional "mere continuation" exception to encompass the broader "substantial continuation" exception adds little in the end. In the cases in which the broader exception has

been applied to hold an asset purchaser liable, there has almost always been some fraudulent intent and collusion present, in which case the purchaser would have likely already been liable under another traditional exception—the fraudulently-entered transaction exception. *See, e.g., United States v. Carolina Transformer Co.,* 978 F.2d 832, 839–41 (4th Cir.1992) (children of seller's owner were sole shareholders in purchaser, giving the "unmistakable impression that the transfer ... was part of an effort to continue the business in all material respects yet avoid the environmental liability"); *United States v. Distler,* 741 F.Supp. 643, 646–47 (W.D.Ky. 1990) (key employees of seller formed new purchasing corporation); *cf. Oner II, Inc. v. U.S. EPA,* 597 F.2d 184, 186–87 (9th Cir. 1979) (imposing liability under FIFRA where new corporation was apparently formed for the very purpose of purchasing assets and carrying on the operations of the environmentally-burdened corporation). *But see Kleen Laundry & Dry Cleaning Servs., Inc. v. Total Waste Mgmt. Corp.,* 817 F.Supp. 225, 231 (D.N.H.1993) (no evidence of collusion or fraud, but court imposed successor liability where purchaser assumed seller's customers and serviced them without interruption with the same drivers and trucks under new name).

Thus, there is no "substantial continuation" exception in this circuit. The district court therefore correctly granted PureGro summary judgment on this issue.

### III. The Fraudulently–Entered Transaction Exception

■ As with the "mere continuation" exception, the formulation of the fraudulently-entered transaction exception is identical under California law or the "federal common law" of this circuit. We took note of the existence of this exception in *Louisiana–Pacific,* but did not apply it. 909 F.2d at 1263 (asset purchaser may be liable under CERCLA if "[t]he transaction was fraudulently entered into in order to escape liability"). Although other courts have also recognized the availability of this exception under CERCLA, none have found occasion to apply it. In *United States v. Mexico Feed and Seed Co.,*

980 F.2d 478 (8th Cir.1992), the Eighth Circuit touched on the exception in dicta, distinguishing the case before it from one that would be covered by this exception, in which the purchasing corporation bought only "clean" assets and left the "dirty" assets behind with an insufficient asset pool to cover any potential liability. *Id.* at 489–90. Under traditional fraudulent conveyance law, the sufficiency of the consideration given for the sale also plays a large factor in determining whether the sale was fraudulent. *Cf. id.*

Even though PureGro knew of B & B's environmental problems and bought only "clean" assets, the sale did not provide B & B a means of escaping liability. B & B had insufficient assets to cover its liability even before the sale—indeed, this fact was the catalyst for the sale. Nor does the record suggest that there was any intent on behalf of the purchaser or seller to construct the sale solely to circumvent CERCLA liability. Moreover, PureGro paid the appraised value for each item, and the Railroads did not present any evidence suggesting that the appraisal was inaccurate. *See Mexico Feed,* 980 F.2d at 490 (asset purchaser is not liable simply because it "shopped well").

■ The Railroads contend that in addition to acquiring half of B & B's assets, PureGro actually acquired B & B's goodwill without paying any consideration, and that this creates an issue of fact as to the fraudulent transaction exception. The record indicates, however, that ninety percent of the time, clients follow PCAs, and PureGro merely offered employment to PCAs that would be out of work when B & B closed its doors. No agreement between PureGro and B & B required PureGro to employ the PCAs. The fact that PureGro managed to sign the PCAs (and thus gain their attendant business) rather than allowing a competitor to employ them is not relevant to the fraudulent transaction issue. The district court properly recognized that the PCAs had to find employment somewhere and that PureGro was fortunate to have hired them.

PureGro sought summary judgment on this issue, and thus the Railroads had the burden of proving that a genuine issue of fact existed for trial. *Anderson v. Liberty Lobby,*

*Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We agree with the district court that the Railroads failed to create a genuine issue of fact on this exception.[5]

AFFIRMED.

---

**5.** Litigation often produces criticism for its participants. This case, however, was extraordinarily well briefed and argued by consummate professionals on both sides and we are grateful for that.