AMCAL MULTI–HOUSING, INC.; AMCAL General Contractors, Inc.; AMCAL Diversified Corporation; AMCAL Enterprises, Inc.; Avenue 26 Condominiums, LLC; Camino Al Oro Fund, L.P.; and AMCAL Tesoro Del Valle Fund, L.P., Plaintiffs,

v.

PACIFIC CLAY PRODUCTS, Defendant.

No. EDCV–06–280–SGL.

United States District Court, C.D. California.

Oct. 10, 2006.

Alan R. Maler, Greenberg Traurig, Gregory D. Trimarche, Greenberg Traurig, Scott David Nelson, Greenberg Traurig, Costa Mesa, CA, for AMCAL Multi-Housing Inc. a California Corporation, AMCAL General Contractors Inc. a California Corporation, AMCAL Diversified Corp. a California Corporation, AMCAL Enterprises Inc a California Corporation, Avenue 26 Condominiums LLC, a California Limited Liability Company, Camino Al Oro Fund LP, a California Limited Partnership, AMCAL Tesoro Del Valle Fund LP, a California Limited Partnership, Plaintiffs.

Emily L. Kennedy, Allen Matkins Leck Gamble Mallory and Natsis, Patrick E. Breen, Allen Matkins Leck Gamble Mallory and Natsis, Randal Ivor-Smith, Allen Matkins Leck Gamble Mallory and Natsis, Timothy Bourke McGinity, Allen Matkins Leck Gamble Mallory and Natsis, Los Angeles, CA, for Pacific Clay Products a California corporation, Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND

LARSON, District Judge.

This case concerns the liabilities of a potentially responsible party ("PRP") under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") for hazardous waste it voluntarily cleans up, as well as the extent which the PRP can then recoup such cleanup costs from other parties who are, in whole or in part, responsible for the presence of that waste on the property.

Plaintiffs AMCAL Multi–Housing, Inc., AMCAL General Contractors, Inc., AMCAL Diversified Corporation, AMCAL Enterprises, Inc., AMCAL Tesoro Del Valle Fund, L.P., Camino Al Oro Fund, L.P., and Avenue 26 Condominiums, LLC (collectively "AMCAL entities") are the owners of property located at Avenue 26 and Humboldt Street in Los Angeles, California.

The complaint alleges Pacific Clay Products ("Pacific Clay") "owned and operated a clay product and/or ceramic manufacturing facility on" the same parcel of property "from 1923 to 1953." (Compl.¶ 9). It is further alleged that Pacific Clay is the successor in interest "to certain corporations and other entities whom owned and/or operated the facility on the property during the period of approximately 1896 to 1923." (Compl.¶ 10). Pacific Clay's "manufacturing operations at the property included extensive lead-glazing and kiln-

firing activities ... known for causing lead contamination ...." (Compl.¶ 19). Pacific Clay "routine[ly] spill[ed] ... liquid glaze materials and dispers[ed] ... lead-laden dust from dried glaze ...." (*Id.*) Moreover, when Pacific Clay vacated the premises in 1953, it "left buried at the property a network of kilns, airways, drainage channels, connecting tunnels and other subsurface structures containing large quantities of putty-like, lead-laden waste materials" that was so extensive that "much of the soils in proximity to the buried structures also had high levels of lead contamination." (*Id.*)

In November, 2002, AMCAL Multi–Housing contacted E.B. Malone Corporation to purchase "property located at 306–360 West Avenue 26 and 2301–2301½ Humboldt Street" for "residential and retail uses, including more than 300 units of affordable housing." (Def's Request Judicial Notice, Ex. A 5).[1] During the negotiations regarding the potential sale of the property, AMCAL Multi–Housing retained an environmental consulting firm, Glenfos, Inc., to "perform a Phase I and a Phase II investigation to determine whether any hazardous substances were present" on the property. (Def's Request Judicial Notice, Ex. A 6; Compl. ¶ 15). "Additional ... investigations were performed by the seller and its consultants." (Compl.¶ 15). Glenfos' investigation for AMCAL Multi–Housing revealed the following: That Pacific Clay "had used the site as a manufacturing facility for fired clay products," Pa-

---

**1.** The AMCAL entities object to use of pleadings (in this case, a first amended complaint) they filed in a parallel state court matter. Although it is generally the case that a court must accept as true the factual allegations contained in a complaint when a motion to dismiss has been brought, courts "need not ... accept as true [those] allegations [in the complaint] that contradict matters properly subject to judicial notice or by exhibit." *Spre-*

*well v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir.2001). Given that the more detailed factual statements contained in the AMCAL entities' state court pleadings (which are themselves subject to judicial notice) call into doubt some of their factual allegations contained in the complaint before this Court, the Court finds that not giving credence to those contrary factual assertions in the present complaint is warranted.

cific Clay placed "aboveground and below ground storage tanks" on the property, and Glenfos had unearthed "the presence of petroleum hydrocarbon contaminations in portions of the site, including in the areas in which the storage tanks were located, as well as contamination from other hazardous substances, including but not limited to lead and other heavy metals in areas throughout the site." (Def's Request Judicial Notice, Ex. A 6).

Despite this report, AMCAL Multi–Housing went forward with "acquir[ing]" the property in question "on or about November 25, 2003, for the purpose of developing affordable housing and other residential projects on the Site" and "continues to own the Site." (Compl.¶ 12). AMCAL General Contractors, Inc., AMCAL Diversified Corporation, Camino Al Oro Fund, L.P., and AMCAL Tesoro Del Valle Fund, L.P., "engaged in, participated in, provided goods or services in connection with, or otherwise were involved" in the redevelopment project with AMCAL Multi–Housing. (Compl.¶ 13). These same four entities "share a common owner with, or otherwise are related to," AMCAL Multi–Housing. (*Id.*) Nowhere does the complaint explain the relationship between the two remaining plaintiffs—Avenue 26 Condominiums, LLC, and AMCAL Enterprises, Inc.—and the other plaintiffs either in respect to the redevelopment project or their corporate relationship, if any. Instead, all that is stated in the complaint is that all the plaintiffs "entered into a series of written and unwritten agreements with one another concerning the sharing of response costs and allocation of losses relating to the environmental clean-up costs incurred in connection with the redevelopment project." [2] (*Id.*)

"In early 2004, during the course of demolishing and removing the former commercial buildings on the property to prepare the site for construction of residential buildings, [plaintiffs] discovered buried kilns, tunnels, drainage channels, bricks, pottery shards, a putty-like waste material, and soils contaminated with lead and other hazardous materials." (Compl.¶ 16). Such hazardous waste "had not [been] discovered ... during the pre-acquisition due diligence investigation of the property because the buried lead wastes had been built over with buildings and parking facilities, and because the buried brick structures caused 'drill refusal' when attempts were made to obtain subsurface soil samples from the areas of the property where the buried lead wastes were [later] located." (*Id.*)

The AMCAL entities immediately reported the presence of this hazardous waste to the Los Angeles County Fire Department when it was discovered. (Compl.¶ 24). Because of the buried hazardous waste found at the property, the

---

**2.** Pacific Clay contends that the uncertainty over each of the AMCAL entities relationship to the property, and whether all of them actually incurred any cleanup costs, prevents a finding that they all have standing to pursue a claim for recoupment of those cleanup costs. Although the description by counsel for the AMCAL entities at oral argument of the legal relationships between each of these entities and the property does place into doubt whether all, as opposed to just some, of those entities actually incurred cleanup costs, or were otherwise in any way involved in the acquisi-

tion of the property when disclosure of the contaminates was uncovered, the Court is left with the allegations in the complaint, which clearly states that all the AMCAL entities incurred costs in one form or another. Given that assertion, the Court finds that the AMCAL entities have standing to prosecute their CERCLA claim. That being said, in filing its amended complaint, the AMCAL entities should clearly delineate these respective relationships, lest a well-grounded motion for more definite statement be filed by Pacific Clay.

Los Angeles County Fire Department, the Los Angeles Regional Water Quality Control Board, and the California Department of Toxic Substances Control either "directed" or "forced" the AMCAL entities "to perform an extensive, unexpected subsurface environmental cleanup of the property in 2004," with cleanup costs totaling $6 million, pursuant to "a remediation work plan demanded, reviewed, modified, and finally approved by" the state public agencies. (Compl.¶¶ 14, 17, 25). In addition, performing the environmental cleanup delayed redevelopment of the property for nine to twelve months. (*Id.*)

The AMCAL entities have filed suit against Pacific Clay seeking recoupment of its response costs pursuant to section 107 of CERCLA, declaratory relief under CERCLA, and an assortment of related state-law claims for private and public nuisance, trespass, equitable indemnity, and California Health and Safety Code § 25363.

Pacific Clay's challenge to the AMCAL entities' section 107 claim is rather straightforward. Pacific Clay notes that PRPs are barred under Ninth Circuit precedent from bringing a section 107 cost recovery claim. *See Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298 (9th Cir.1997). Instead, PRPs are relegated to seeking a contribution claim under section 113(f)(1). *See id.* Furthermore, the Ninth Circuit has held that this rule is no different if the PRP involved was not responsible for the hazardous waste at the

site, but was merely a PRP based on its status as the present owner of the property. *See Western Properties Serv. Corp. v. Shell Oil Co.*, 358 F.3d 678 (9th Cir.2004). To obtain contribution under section 113(f)(1), in turn, the Supreme Court requires that a PRP first have either been sued in a section 107 cost recovery action or compelled to perform the cleanup by the Federal government. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 125 S.Ct. 577, 584, 160 L.Ed.2d 548 (2004). Pacific Clay asserts that the AMCAL entities are a PRP as they are the current owners or operators of the property where there was a release of a hazardous substance, and there is no allegation in the complaint that the AMCAL entities were first sued or otherwise compelled to perform the cleanup by the Federal government (or had entered into a settlement with the federal or state government regarding its share of liability for said cleanup costs). In light of these facts, Pacific Clay argues that the AMCAL entities are barred from bringing any type of CERCLA action against it in the absence of some proof that they qualify for some statutory defense from being designated a PRP.

The AMCAL entities dispute Pacific Clay's central contention that they qualify as a PRP. They note that their complaint contains the blanket assertion that they are "not an 'owner' or 'operator' of any 'facility' as defined under CERCLA, nor otherwise liable as a 'potentially responsible party' under CERCLA." [3]

**3.** During oral argument, counsel for the AMCAL entities argued that not all of the entities were owners of the property at the time the cleanup costs were incurred (apparently there were a series of supplemental transfers of title to the property amongst the entities after the purchase), and that this fact negates at least some of these entities' PRP status, which concerns only the current owner of a contaminate property or one who was the owner at

the time of disposal. The problem with this argument is that none of the facts offered by counsel in support of it at oral argument were contained in the complaint. The complaint, as written, represents that AMCAL Multi–Housing acquired the property, that the other entities are corporate affiliates of AMCAL Multi–Housing, and that they were all involved with redevelopment project. (Compl.¶ 13). Nowhere is it alleged that the

(Compl. ¶ 36). According to the AMCAL entities, that should be the beginning and the end of the analysis. So long as they make a prima facie case for Pacific Clay's liability, the AMCAL entities contend a motion to dismiss is unwarranted.

 The problem with this analysis is that it flies directly in the face of well-established jurisprudence governing Rule 12(b)(6) motions. If a legal impediment such as an affirmative defense or some other bar to recovery is apparent from the face of the complaint, then a motion to dismiss for failure to state a claim is mandated. *See Jablon v. Dean Witter*, 614 F.2d 677, 682 (9th Cir.1980); *see also* 2 JAMES WM. MOORE, MOORE'S FEDERAL PRACTICE § 12.34[4][b] at 12–74 (3rd ed.2006). Here, the complaint specifically mentions that the AMCAL entities are (in one form or another) collectively the present owners of the property and are seeking under CERCLA to recoup the cleanup expenses they incurred in removing hazardous waste found (and which they allege was deposited by Pacific Clay during its stewardship) on their property. The statute defines a PRP as including those who are the current "owner and operator of a vessel or a facility," § 107(a)(1), with the term "facility" meaning, among other things, "any site or area where a hazardous substance has been deposited." § 101(9). The AMCAL entities meet this definition as they are the current owners of the contaminated property, notwithstanding the assertion in the complaint that they are not a PRP. Indeed, it is well-settled that a court is not to give deference to legal conclusions in a complaint in passing on a motion to dismiss; only factual allegations are entitled to such deference. *See United States ex rel. Chu-*

*nie v. Ringrose*, 788 F.2d 638, 643 n. 2 (9th Cir.1986)("While the court generally must assume factual allegations to be true, it need not assume the truth of legal conclusions cast in the form of factual allegations").

Here, the AMCAL entities have posed a legal conclusion—that they are not a PRP—masquerading as a factual allegation. The cases cited by the AMCAL entities for the proposition that a motion to dismiss is not the proper vehicle for resolving a PRP affirmative defense are notable for one thing—their age. All pre-date the decisions of the Ninth Circuit in *Pinal Creek* and *Western Properties* as well as the Supreme Court's decision in *Cooper Industries*. Those decisions make clear that a legal impediment to stating a claim under CERCLA exists for PRPs who seek either cost recovery or contribution claims. If it is apparent on the face of the complaint that a plaintiff is a PRP, and no allegations in the complaint demonstrate a means of escaping the consequences of that status per the Ninth Circuit's and Supreme Court's decisions, then judgment in favor of the defendant is mandated. *See California Dept. of Toxic Substances Control v. City of Chico*, 297 F.Supp.2d 1227, 1234 (E.D.Cal.2004)(granting motion to dismiss based on plaintiff's PRP status and legal holding in *Pinal Creek*); *Sunnyside Development Corp. v. Opsys U.S. Corp.*, 2006 WL 1128039, at *2 (N.D.Cal. Apr. 26, 2006)(upholding motion to dismiss based on inadequacies in complaint in light of plaintiff's potential PRP status and Ninth Circuit's decision in *Pinal Creek*); *Mission Linen Supply v. New Petrolane, Inc.*, 1998 WL 273004, at *1 (N.D.Cal. May 22, 1998)(granting motion to dismiss plain-

property has been sold or otherwise disposed of since it was acquired in 2003. Such allegations in the complaint clearly portray the AMCAL entities as current owners of the

property. Indeed, when pressed on this point—the corporate affiliation amongst the entities—counsel essentially conceded that "one could argue they are" current owners.

tiff's section 107 claim for cost recovery in light of it's PRP status and decision in *Pinal Creek* ).

Indeed, the Ninth Circuit's decision in *Pinal Creek* was itself based on a district court's denial of a motion to dismiss a PRP's cost recovery claim under section 107. *See Pinal Creek Group v. Newmont Min. Corp.,* 926 F.Supp. 1400 (D.Ariz. 1996). As the complaint crafted by the AMCAL entities clearly demonstrates that they are a PRP, they must confront the legal consequences that flow from such a designation.

■ Understanding this, the AMCAL entities next attack the legal consequences flowing from their PRP status in two ways. First, they contend that *Pinal Creek* is distinguishable as they are bringing an implied right to contribution, not a cost recovery claim, under section 107, and, citing to a number of district court decisions from this Circuit, further argue that *Pinal Creek* does not speak to or bar a PRP from bringing such an implied contribution claim. *See Adobe Lumber, Inc. v. Taecker,* 2005 WL 1367065, at *1 (E.D.Cal. May 24, 2005); *Kotrous v. Goss–Jewett Co. of Northern California, Inc.,* 2005 WL 1417152, at *3 (E.D.Cal. June 16, 2005); *Aggio v. Aggio,* 2005 WL 2277037, at *5–6 (N.D.Cal. Sept.19, 2005). *But see City of Rialto v. United States Dep't of Defense,* Case No. EDCV–04–00079–VAP (SSx) at * 6–14 (C.D.Cal. Aug. 16, 2005). Those courts have noted that the Ninth Circuit decisions cited by Pacific Clay have enough "wiggle room" to allow an implied contribution claim under section 107 to proceed. *Adobe Lumber, Inc. v. Hellman,* 415 F.Supp.2d 1070, 1077 (E.D.Cal.2006). Moreover, the AMCAL entities note that, even if *Pinal Creek* does bar a PRP from bringing such a section 107 implied contribution claim, their complaint has pleaded the existence of at least one or more pres-ent landowner defenses to being considered a PRP. Assuming they fall within one of these defenses, the AMCAL entities note that *Pinal Creek* would not bar them from bringing a section 107 cost recovery claim.

Resolving this argument requires an understanding of the context of CERCLA's statutory history and close consideration of the Ninth Circuit's decision in *Pinal Creek* both as to what it said, and more importantly for this case, what it did or did not leave unsaid.

CERCLA was enacted into law in 1980 in an effort to remediate property sites that were contaminated with hazardous substances by encouraging "the prompt and effective cleanup of waste disposal sites and ... assur[ing] that" those "responsible" for creating or maintaining the hazardous condition "bore the cost of remedying the conditions they created." *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1455 (9th Cir.1986). As originally enacted, CERCLA sought to achieve the first goal by allowing the Federal government to clean up a contaminated site itself, *see* § 104, or by compelling responsible parties to perform the cleanup. *See* § 106(a). In either event, the government was permitted to recover its response costs under section 107, the so-called "cost recovery" section of CERCLA. Section 107(a) provides that certain persons, including the owner or operator of a contaminated site, "shall be liable" for, among other things, "all costs of removal or remedial action incurred by the United States Government ... [that are] not inconsistent with the national contingency plan." § 107(a)(4)(A). In addition to permitting such suits by the Federal government for reimbursement of its costs in cleaning up such sites, section 107(a) also permitted private parties to pursue such cost recovery actions by making PRPs also liable for

"any other necessary costs of response incurred by *any other person* consistent with the national contingency plan." (emphasis added).

One of the first questions raised after CERCLA's passage was whether section 107 allowed a PRP that had voluntarily incurred cleanup costs (that is, not as a result of being compelled to do so by the government) to recover those costs from other PRPs. This question also raised a related one — could a PRP that had been sued in a cost recovery action (either by the government or by another PRP) seek contribution under § 107 from other PRPs for what it was forced to (or may have to) pay as a result of the earlier (or pending) suit. Given that the statute did not at the time contain an express provision providing for such a right to contribution, the latter question was couched as one of whether section 107 implicitly allowed for such contribution actions.

Before either question was settled by the courts, Congress stepped in by amending CERCLA in the Superfund Amendments and Reauthorization Act of 1986, to contain a new section 113(f)(1). This new section authorized "any person" to "seek contribution from any other person who is liable or potentially liable under [section 107(a) ], during or following any civil action under [section 106] or under [section 107(a) ]," and further stated that "[n]othing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under" sections 106 or 107(a). The 1986 amendments also created a new section 113(f)(2) that similarly authorized a right of contribution for any person who has settled with the Federal or a State government its liability "for some or all of a response action or for some or all of the costs of such action." Thus, after the 1986 amendments, a PRP that incurred clean up costs (be it as a result of being compelled or sued to do so, or having settled such a claim beforehand with governmental agencies) to remediate environmental contamination could unquestionably seek contribution under section 113(f) from other PRPs.

It was with this statutory backdrop that the Ninth Circuit in *Pinal Creek* confronted the question of whether a PRP could also bring a section 107 cost recovery action for "the totality of its response costs" against other PRPs. *Id.* at 1301. The Ninth Circuit answered the question in the negative, explaining that, "because all PRPs are liable under the statute, a claim by one PRP against another PRP necessarily is for contribution." *Id.* This conclusion was compelled in the Ninth Circuit's view by the fact that section 107 itself "implicitly incorporates a claim for contribution" between PRPs. *Id.* In other words, section 107's statutory language precluded a PRP from gaining anything more under the section than an apportionment of the costs it incurred. As explained by the Ninth Circuit, "[u]nder the literal language of § 107 ... a PRP is partly responsible for its cleanup costs and, as 'any other person' under § 107, can also hold other PRPs liable for a portion of those same costs." *Id.* Given the dual role a PRP has under section 107—both as a party to whom a share of response costs may be owed as well as one who owes some of those response costs—the net effect from applying section 107's language between PRPs was "in essence" to establish "a claim for contribution," something which, "albeit implicitly," the Ninth Circuit found to be "imbedded in the text of § 107." *Id.* Such a reading of how section 107 operates in the context of PRPs foreclosed the ability for a PRP to bring a section 107 claim seeking joint and several liability for the totality of its cleanup costs. "CERCLA's claim for contribution creates several-only

liability among PRPs." *Id.* at 1303. Finding such an implicit right to contribution in section 107 as a reason to deny a PRP access to a cost recovery action under that section, however, required the court to confront how such an implicit right could exist in light of section 113(f), which expressly allows for such a right to contribution for and between PRPs. The existence of such an implicit right was further complicated by the fact that section 107 contained more generous provisions (most notably, a longer statute of limitations) than section 113. *Compare* § 113(g)(2) (establishing a six year statute of limitations for actions to "recover[ ] the costs referred to in [section] 107") *with* § 113(g)(3)(setting out a three year limitations period for an "action for contribution [of] response costs"). As one court explained: "Congress' addition of § 113 posed a dilemma. Courts saw that CERCLA, as amended, created a situation where litigants might 'quickly abandon section 113 in favor of the substantially more generous provisions of section 107,' thus rendering § 113 a nullity. To prevent § 107 from swallowing § 113, courts began directing traffic between the sections." *Atlantic Research Corp. v. United States,* 459 F.3d 827, 832 (8th Cir.2006)(citing *New Castle County v. Halliburton NUS Corp.,* 111 F.3d 1116, 1123 (3rd Cir.1997)).

*Pinal Creek* directed such traffic by noting that although the right to contribution was found (even if implicitly) in section 107, the mechanisms for implementing that right were contained in section 113(f). As explained by the court, passage of section 113 simply "confirmed and clarified an existing claim for contribution under § 107," one where, "work[ing][t]ogether," sections "107 and 113 provide and regulate a PRP's right to claim contribution from other PRPs," with section 107 "creating [implicitly] the right to contribution" while the

" 'machinery' of § 113 govern[ing] and regulat[ing] such actions." *Id.* at 1301–1302.

In short, *Pinal Creek* construed the 1986 amendments to CERCLA as having effectively created a two-headed statutory construct for contribution claims—"a hybrid action under section 107(a)(4)(B) and 113(f), with the former provision creating the implied right of contribution, and the latter qualifying the nature of that claim." Craig N. Johnson, *Current Landowner Liability Under CERCLA: Restoring the Need for Due Diligence,* Fordham Envtl. L. Rev. 401, 467 n. 246 (1998); *see also Pinal Creek,* 118 F.3d at 1302 (observing that section 107 "creat[ed]" the contribution claim and section 113 "qualify[ed]" it through its provisions "for apportioning that" claim). Stated another way, *Pinal Creek* latched and bound together sections 107 and 113 as a single cohesive whole for purposes of any claim brought under CERCLA by a PRP. Any "claim asserted by a PRP under § 107 requires the application of § 113." *Id.* at 1306. By doing so, the Ninth Circuit effectively steered PRPs away from § 107 and required them to use § 113 to recoup and apportion their cleanup costs, thereby ensuring the continued "vitality" of "section 113's Congressionally-mandated constraints." *Atlantic Research,* 459 F.3d at 832.

In announcing its decision, *Pinal Creek* left open whether an exception to this statutory analysis existed for a PRP who had "not polluted the site in any way," but who did not fit within the then-existing statutory defense for innocent landowners contained in section 101(35)(A)(i). *Id.* at 1303 n. 5. That section considered a party an innocent landowner when "[a]t the time [they] acquired the facility [they] did not know and had no reason to know that any hazardous substance which is the subject of the release ... was ... on, in, or at the facility." That question was later resolved

by the Ninth Circuit in the negative in *Western Properties.* 358 F.3d at 690–92. In the process of answering that question, the court in *Western Properties* also made some comments that re-emphasized that the nature of a contribution claim for a PRP was in the form of a hybrid action pieced together using section 107 and 113. The court, for instance, commented that "a PRP is limited to bringing a contribution action governed by § 113." *Id.* at 692 (emphasis added). It explained that the 1986 amendments to CERCLA "did not replace the [pre-existing] implicit right of contribution," but instead, through the enactment of section 113, determined the contours of that right, "so that a claim for contribution requires the 'joint operation' of both sections." *Id.* at 685. Removing any doubt that section 107's implicit contribution claim was subjugated to the provisions contained in section 113 was the following comment by the court: "Section 113 is a comprehensive scheme for adjustment of the burden among parties that are liable or potentially liable for § 107(a) recoveries, so there is no reason to read a silent implication of an alternative scheme into § 107(a)." *Id.* at 690.

This calculus changed with *Cooper Industries,* when the Supreme Court held that a PRP cannot seek contributions from other PRPs under section 113(f)(1) when they have voluntarily incurred those clean up costs. To seek contribution under section 113(f) after *Cooper Industries,* a PRP must first either be compelled to perform the clean up and, hence, incur those clean up expenses by the Federal government, *see* § 106, or be or have been sued in a cost-recovery action under section 107. That such a requirement exists should come as no surprise as it arises straight from the statute's text, which allows "[a]ny person [to] seek contribution from any other person who is liable or potentially liable under section [107](a) of this title, during

or following any civil action under section [106] of this title or under section [107](a) of this title." § 113(f)(1).

Despite this precedent, several lower courts in this Circuit have posited that a section 107 implied contribution claim still exists independent of and unrelated to section 113's provisions. These courts base their decision on the so-called savings clause contained in section 113(f)(1). The logic of their reasoning goes as follows: (1) *Pinal Creek* recognized that implicit in the text of section 107 was a right to contribution; (2) section 113(f)(1)'s savings clause provides that nothing in section 113 (which they read to mean the 1986 amendments to CERCLA) diminishes a party's right to contribution in the absence of having been forced to incur clean up costs; (3) therefore, even if a PRP's 113 contribution claim is barred as a result of the Supreme Court's holding in *Cooper Industries,* a PRP still can maintain a separate and independent section 107 implied contribution claim. *See Aggio,* 2005 WL 2277037, at *5 ("because PRPs had an implied right to seek contribution under § 107(a) before [the 1986 amendments were] enacted, the savings clause of § 113 preserves this right"); *Kotrous,* 2005 WL 1417152, at *3 ("the Ninth Circuit recognized an implied right of contribution in § 107. The enactment of § 113 in 1986 did not replace the implicit right of contribution in § 107," as those amendments "contained a savings clause").

The fallacy with this reasoning is in its last point of the analysis. As the above discussion concerning *Pinal Creek* demonstrates, the Ninth Circuit has expressly tied and bound any implied contribution claim under section 107 to the "machinery" in section 113. After *Pinal Creek* a section 107 implied contribution claim simply does not exist independently on its own. Such an implicit contribution claim is "gov-

erned," "regulated," and "qualified" by section 113(f). Indeed, to allow such an implicit contribution claim to exist independently would create an awkward statutory scheme where an implied right to contribution in one section of the statute continues to exist untouched even after Congress enacted amendments to conclusively resolve whether such a right to contribution ever existed under the statute. *See* H.R. REP. No. 99–253, pt. 3 at 18–19 (1985)(noting that section 113 "clarifies the availability of judicial review regarding contribution claims"); S. REP. No. 99–11, at 43 (1985)(amendments "clarifies and confirms existing law" through addition of contribution provision); *see also United Technologies Corp. v. Browning–Ferris Industries, Inc.*, 33 F.3d 96, 100 (1st Cir.1994)("Congress, in enacting SARA, sought to codify the case law" allowing for a right to contribution). It would certainly be odd for Congress to have gone to the trouble of enacting amendments setting forth detailed mechanisms "governing" a contribution claim under CERCLA, and yet allow for all of this work to be for naught as a party could simply bypass and ignore these governing provisions through resort to a free-standing contribution claim implicit in section 107. At least one court, however, has so surmised, eschewing section 113(f) as simply "alluding only to [a possible] mechanism for apportioning liability among responsible parties." *Aggio*, 2005 WL 2277037, at *5. However, it was these precise mechanics that the Ninth Circuit fastened onto the right to contribution implicit in section 107.

This leaves the import to be drawn from § 113(f)(1)'s savings clause. The Supreme Court in *Cooper Industries* noted that "the sole function of the sentence is to clarify that § 113(f)(1) does nothing to 'diminish' any causes of action for contribution that may exist independently of § 113(f)(1)." 125 S.Ct. at 583–84. The Ninth Circuit in

*Pinal Creek* held that such a cause of action for contribution existed implicitly in section 107. This fact, however, only begs the question of how this independent cause of action was described by the Ninth Circuit as functioning. In other words, did the implied right of contribution survive the 1986 amendments completely intact and unaltered? *Pinal Creek* does not so hold, for that decision addressed how those amendments modified the implicit right of contribution by introducing the machinery to govern, regulate, and qualify contribution claims. *See* 118 F.3d at 1302. The opinion did not establish that an independent implied right to contribution still exists, but instead held that a PRP's right to claim contribution from other PRPs is controlled by the "joint operation" of sections 107 and 113. *Western Properties*, 358 F.3d at 685; *see also Pinal Creek*, 118 F.3d at 1304 (citing with approval out-of-circuit court decisions that "rejected the argument that the PRP's claim was governed exclusively by section 107"). As a result, the implied right to contribution in the Ninth Circuit did not survive the 1986 amendments as an independent basis for a claim. Rather, those amendments from the Ninth Circuit's perspective changed and qualified that right by providing the "details ... that were missing from the text of section 107." *Pinal Creek*, 118 F.3d at 1301.

Until and unless the Ninth Circuit cuts loose the implied right to contribution under section 107(a) from the moorings of section 113(f)(1), a PRP who voluntarily incurs clean up costs will have no right to recover any of those costs from other PRPs. The only way out is for the PRP to demonstrate its entitlement to one of the many defenses to PRP status found in the statute. *See Pinal Creek*, 118 F.3d at 1300 n. 1 (excluding from its definition of a PRP who is subject to its rule "those 'person[s]

otherwise liable' under § 107(a) who can establish they are not liable by virtue of the defenses set forth in § 107(b)").

It has been suggested that the Supreme Court's decision in *Cooper Industries* undermined this central premise in *Pinal Creek*. The Supreme Court recognized that it had previously stated that sections 107 and 113 "created 'similar and somewhat overlapping' remedies," *id.* at 582 n. 3 (citing *Key Tronic Corp. v. United States*, 511 U.S. 809, 816, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994)), a statement the Ninth Circuit found key in arriving at its conclusion that the two sections worked together to create a single right of contribution. *See* 118 F.3d at 1301–1302 (citing to passage from *Key Tronic* noted above as supporting its conclusion that "[t]ogether, §§ 107 and 113 provide and regulate a PRP's right to claim contribution from other PRPs"). The Supreme Court in *Cooper Industries,* however, noted that, despite this similarity and overlap between sections 107 and 113 "at a general level," the two sections were "clearly distinct." 125 S.Ct. at 582 n. 3.

Two circuits following *Cooper Industries* have found this comment from the Supreme Court as rendering their prior precedent, which had a similar construction of section 107's interplay with section 113 for contribution claims as that of the Ninth Circuit's in *Pinal Creek*, as "no longer mak[ing] sense." *Consolidated Edison Co. of New York, Inc. v. UGI Utilities, Inc.,* 423 F.3d 90, 99 (2d Cir.2005); *see also Atlantic Research,* 459 F.3d at 833–35; *But see E.I. DuPont De Nemours & Co. v. United States,* 460 F.3d 515, 532 (3d Cir.2006)(holding that its prior precedents were not undermined by decision in *Cooper Industries* ). Those courts, following the statutory language in section 107, held that a PRP could bring a free-standing section 107 cost recovery claim against other responsible parties subject to those PRPs being able to bring a section 113 counterclaim for contribution. *See Consolidated Edison,* 423 F.3d at 99–100 & n. 9. Although it may well be that the Ninth Circuit may re-evaluate its prior construction of CERCLA in light of the Supreme Court's decision in *Cooper Industries* so as to allow PRPs to bring a section 107 claim (be it a freestanding section 107 implied contribution claim or a section 107 cost recovery one), such a decision is for that court, not this one, to perform. Nothing in the Supreme Court's decision in *Cooper Industries* compels (as opposed to suggest, even if strongly) the conclusion that the basis for the Ninth Circuit's decision in *Pinal Creek* is invalid. Bound by the Ninth Circuit precedent on this point, the Court finds that the AMCAL entities' status as a PRP bars its ability to bring an implied right of contribution under section 107 absent some basis for finding that it has a defense to being treated as a PRP.

One final point must be made. Some of the lower courts in this circuit that have allowed PRPs to bring a section 107 implied contribution claim after *Cooper Industries* have done so out of public policy concerns that a contrary result would leave PRPs, who knew of the hazardous substance when they acquired the site (and therefore not qualifying as an innocent landowner) and took the salutary path of quickly and voluntarily cleaning up those contaminants without having to first be compelled to do so by the government, holding the bag with no way to recoup their costs from other parties who are responsible for those cleanup costs (and indeed from other parties who may be completely or totally responsible for the incursion of those costs). *See Hellman,* 415 F.Supp.2d at 1078. Such concerns for the plight of such a PRP creates a false dilemma, as it fails to take into account recent amendments to CERCLA.

Specifically, in 2002 Congress amended CERCLA with the passage of the Brownfield Revitalization and Environmental Restoration Act. The 2002 amendments sought to provide incentives for investors to purchase and redevelop so-called brownfield sites, usually vacant or mothballed parcels of industrial or commercial property in economically depressed downtown urban areas that sit idle out of fear by potential investors that the property is possibly contaminated, thereby exposing those who would invest in purchasing and re-developing the site to potential liability under CERCLA. One method of incentivizing such redevelopment was by broadening the innocent landowner defense and by creating new "bona fide purchaser" and "contiguous property owner" categories against PRP designation to protect new purchasers of contaminated properties. Whereas before a purchaser of a contaminated property was designated a PRP if they knew or had reason to know of the contamination beforehand even if they had nothing to do with that contamination, now a *bona fide* purchaser that acquires a brownfield site fully aware of the site's contaminated character is shielded from PRP status by establishing that the release of the contamination occurred prior to its acquisition of the property and the purchaser made all appropriate inquiries (such as performing an assessment of the property) and took reasonable steps to stop any continuing and prevent any future releases. *See* § 101(40).

Indeed, the AMCAL entities argue that in addition to qualifying as an innocent landowner, they also qualify as a *bona fide* purchaser. If true, such defenses would defeat Pacific Clay's contention that the AMCAL entities are precluded as a matter of law from bringing a section 107 claim, albeit one for cost recovery and not for implied contribution. The problem for the AMCAL entities is that the allegations in its complaint clearly show that they should have known about the contamination at the site—the environmental consultant hired by them "disclosed the presence of," among other things, "lead and other heavy metals in areas throughout the site"— thereby precluding application of the innocent landowner defense. At oral argument counsel for the AMCAL entities explained that the lead mentioned only concerned that found in superficial level of the soil, but that the lead contamination cleanup costs comprising the "vast majority" of those sought to be recovered in the present action were those associated with the lead putty found buried under brick tunnels placed underground at the site by Pacific Clay which, their environmental consultants will testify, was "virtually impossible to discover ... by conventional means of investigating properties." Counsel explained that the brick tunnels in question were "constructed long before [the city] started requiring as-built drawings of things, so there were no documents on file" evincing the existence of these tunnels. The fact that the tunnels were made out of brick also made it unreasonable to uncover the lead putty's existence as any effort in excavating those portions of the site where the tunnels laid buried would cause drill-bit refusal when a drill struck the tunnel leaving the impression that the drill had struck bedrock. As explained by counsel:

> "We swiss-cheesed the site." However, we suffered what we call drill-bit refusal in a number of places that we were attempting to excavate the site, which simply means that as we sent our drill down to take borings, the drill bit would not go any further. That happens fairly often, and it typically happens when you run into bedrock ...; and so the environmental consultants in this instance concluded "we're getting drill refusal; it

looks like we're hitting bedrock; we're not going to be able to take soil samples out of bedrock; we've investigated this soil as fully as we can investigate it."

Such facts certainly would support the notion that the AMCAL entities had no knowledge, nor had they reason to know, of at least the lead putty contamination (as opposed to the surface lead particulates found throughout the property) found at the site when they purchased it. The problem is that nothing in the complaint matches up with the factual assertions made by counsel at oral argument.

By the same token, counsel argue that his clients meet all the standards for a *bona fide* purchaser because the complaint notes that they "performed due diligence environmental investigations of the property" and that the cleanup of the same was done under "the oversight" of various state, county and city agencies. (Compl.¶¶ 15, 17). The problem with this argument is that the allegations in the complaint are left bare of any reference to the other requirements for a *bona fide* purchaser. The due diligence spoken of in the statute also concerns efforts made by the party "into the previous ownership" of the property and to give notice to the same when it discovers any hazardous substance on the property. § 101(40)(B)(i), (C). Here, the only inquiry noted in the AMCAL entities' complaint is with respect to determining the presence of contaminants at the site before acquiring the property. The complaint therefore simply does not set forth sufficient factual detail evincing the AMCAL entities as falling within the *bona fide* purchaser defense.

As such, the Court finds that, as it stands now, the AMCAL entities' CERCLA claim is barred as they are a PRP that cannot bring a section 113(f)(1) contribution claim per *Cooper Industries*, cannot bring a free-standing section 107 implied contribution claim per *Pinal Creek*, and cannot bring a section 107 cost recovery claim as it has failed to allege sufficient facts to bring it within one of the statutorily defined defenses to PRP designation status. That said, the AMCAL entities could amend its complaint to bring the latter claim.

In doing so, Pacific Clay argues that the AMCAL entities must also set forth detailed allegations demonstrating, as required under section 107(a), that the cleanup costs they incurred were in conformity with the national contingency plan. This argument is misplaced. The present complaint gives detailed allegations concerning the description of the specific type of response costs incurred, and a description of the regulatory agencies involvement in and oversight of the remedy selection process and remedy implementation. (Compl.¶¶ 14, 17, 25, 35). At this stage in the litigation, such factual averments are sufficient to survive a motion to dismiss.

Shifting gears, Pacific Clay next argues that the allegations in the complaint concerning the AMCAL entities consistency with the national contingency plan are legally problematic, either because they did not consider alternate remediation measures or failed to involve the public in drafting its remediation plan. (Mot. Dismiss at 14–15). What is notable about these arguments is that Pacific Clay takes matters that the complaint is silent upon, writes in many of these factual deficiencies into the complaint, and then, not surprisingly, urges to the Court their legal insufficiency. (Mot. Dismiss at 15 ("AMCAL has not alleged that it conducted a feasibility study as required under CERCLA. Rather, it apparently considered only one option for the remediation of the property—complete excavation, hauling and disposal" (emphasis added))). Admittedly, the complaint does not set forth in excruciating detail

how much public participation or what (if any) measures were debated before commencing with the cleanup, but its absence does not necessarily mean its opposite occurred. Consistency with the national contingency plan is a fact-intensive determination not easily susceptible to resolution on a motion to dismiss. *See Mola Development Corp. v. United States,* 1985 WL 9129, at *2 (C.D.Cal. July 30, 1985)("The determination of [a cleanup was consistent with the national contingency plan] is not appropriate on a motion to dismiss because it would require this court to make findings of fact while a motion to dismiss is only a challenge to the face of the complaint"); *see also In re Burbank Environmental Litigation,* 42 F.Supp.2d 976, 980 (C.D.Cal.1998)(whether "response cost" is "consistent with national contingency plan ... is a question of fact"). The present complaint provides that certain state and local regulatory agencies were involved in the development of the cleanup plan. Pacific Clay's challenge to the process through which that plan was finalized is not so much a legal one as a factual one (and even then one based on facts filled in by Pacific Clay's motion, not the complaint itself). Such judgment must await the development of the record through discovery and any motion for summary judgment that would flow from such unearthed evidence.

Accordingly, the motion to dismiss is GRANTED but with leave for the AMCAL entities to file with the Court within 30 days from the entry date of this Order an amended complaint curing the legal defects identified in this Order with respect to its CERCLA claim.

IT IS SO ORDERED.